UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————————x

STANLEY HENDERSON,

        Plaintiff,

    -against-                                05 Civ. 213 (CM)(LMS)

STATE OF NEW YORK, et al.,

        Defendants.

———————————————————————————x

DECISION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

McMahon, J.:

      Defendants Anthony Loscalzo and Glenn Goord have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiff, who is represented by counsel, has not responded to the motion; he has been in default since mid-November.[1]

      Plaintiff is a former DOCS corrections officer. Plaintiff was terminated by DOCS pursuant to a April 28, 2003 Notice of Discipline ("NOD") After a full arbitration hearing, an independent arbitrator denied plaintiff's challenge to the Notice of Discipline, and authorized DOCS to terminate plaintiff's employment. Plaintiff commenced this civil rights action in January 2005 against the State of New York, Anthony Loscalzo, in his individual capacity, and Glenn Goord, in his individual capacity alleging (1) retaliation; (2) denial of procedural due process; (3) violation of substantive due process; (4) denying equal protection based on his race; and, (5) age discrimination.

---

[1]  The motion was made on or about November 7, 2005. Under this court's rules, plaintiff had two weeks to respond to the motion. No response was received and no request for adjournment was made. Plaintiff's counsel also did not participate in the preparation of a pre-trial order, as required by this court's scheduling order.

By Notice of Motion, dated February 24, 2005, defendant State of New York moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) on the ground that all of plaintiff's claims asserted against the State of New York were barred by the Eleventh Amendment to the United States Constitution. On April 1, 2005, this Court dismissed all claims against the State of New York.

The individual defendants claim that they are entitled to summary judgment of plaintiff's remaining claims for several reasons.

(1) Plaintiff cannot maintain a claim pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §626, because he never filed an administrative complaint with the EEOc or the New York State Commission on Human Rights.

(2) Plaintiff's pre-termination claims of harassment and retaliation are time barred.

(3) Plaintiff has not, in response to this motion, offered any evidence establishing a nexus between his allegations of racial discrimination and the allegedly retaliatory behavior. Nor has he rebutted defendants' legitimate, non-discriminatory reasons for taking disciplinary action against him.

(4) Plaintiff has not established that the procedural safeguards established by the state were insufficient to protect his rights in the disciplinary context.

(5) Plaintiff has not established that the conduct of defendants was arbitrary, conscience-shocking, or oppressive in a constitutional sense.

(6) Plaintiff has not raised an inference that the disciplinary actions taken against him were in fact motivated by racial animus or based on his age, and he has not rebutted, on the undisputed facts in the record, defendants' legitimate, non-discriminatory reasons for taking disciplinary action.

(7) Plaintiff has failed to establish the personal involvement in any constitutional violation of defendants Goord and Loscalzo.

The remaining defendants also argue qualified immunity, but it is not necessary to reach that issue, since plaintiff has not made out any constitutional violation.

## STATEMENT OF FACTS

Because plaintiff has not responded to the motion for summary judgment, the court deems undisputed the facts set forth in defendants' Rule 56.1 motion.

Plaintiff was hired by DOCS on July 6, 1982. Declaration of Kevin McCaffrey ("McC. Dec."), Exhibit B, Deposition of Stanley Henderson, June 27, 2005 and July 11, 2005 (hereinafter "P. Dep."), p. 21. Plaintiff was trained that correction officers are only permitted to use only the force that is reasonably necessary in self-defense, to defend a third party, or to quell a disturbance. Id., p. 23. Plaintiff understood that using more force then is necessary constitutes excessive force. Id.

### A.    Taconic Correctional Facility

Plaintiff was assigned to Taconic Correctional Facility ("Taconic") from 1985 until 2000. Id., p. 26. Anthony Loscalzo was a lieutenant assigned to Taconic from 1995 to 1998. McC. Dec., Exhibit C, Deposition of Anthony Loscalzo, July 18, 2005 and July 25, 2005 (hereinafter "Los. Dep."), p. 21. In addition, plaintiff held various positions in Council 82, the union for correction officers. P. Dep., 28-35. In 1997, plaintiff spoke with Officer Elizabeth Colon concerning an allegation of sexual harassment by Lt. Loscalzo. Id., p. 133.

On February 24, 1999, plaintiff was subpoenaed by the Attorney General's Office to give testimony in a lawsuit brought by Officer Colon against Anthony Loscalzo alleging sexual harassment. Id., p. 138. Lt. Loscalzo was present at the deposition. Id., p. 140. Plaintiff testified that he was approached by Officer Hallock, who alleged sexual harassment by Lt. Loscalzo. She asked plaintiff to speak to Officer Colon. McC. Dec., Exhibit D, Deposition of Stanley Henderson,

dated February 24, 1999 (hereinafter "P. Dep. 99"), p. 10.  Plaintiff may have advised Officer Colon to file a complaint with diversity management, but took no action to investigate the complaint.  Id., pp. 20-21.  Officer Colon provided plaintiff with a statement, but plaintiff returned Officer Colon's written statement to her and asked her to provide another statement.  Officer Colon never gave him another statement. Id., 12-13, 21-22.

Plaintiff could not recall Officer Colon's allegations against Lt. Loscalzo except on one occasion Lt. Loscalzo allegedly told Officer Colon that she "look[ed] nice" as she removed a sweater.  Id., p. 15.  Plaintiff testified that Officer Colon never advised him that Lt. Loscalzo had threatened or retaliated against her because of her sexual harassment allegations.  Id., p. 25. Moreover, plaintiff testified that he was not aware of any incident where Lt. Loscalzo threatened or retaliated against anyone for filing a claim of sexual harassment. Id., pp. 30-31.

## B.    Beacon Correctional Facility

At the relevant times herein, Beacon Correctional Facility ("Beacon") was a minimum security prison that housed female inmates.  Declaration of Dennis Crowley ("Crow. Dec."), ¶ 5; P. Dep., p. 63.  The lieutenants at Beacon assigned to the facility performed tasks normally assigned to deputy superintendents.  Crow Dec., ¶ 8; Los. Dep., p. 87; P. Dep., p. 63; McC. Dec., Exhibit E, Deposition of Robin Maher (hereinafter "M. Dep."), p. 62. Lt. Loscalzo was a member of the executive team,  Crow. Dec., ¶ 9; Los. Dep., p. 87; P. Dep., pp. 63, 172, and was responsible for setting policy and procedure in the facility, staffing, investigating complaints alleging staff misconduct, and investigating inmate misconduct.  Los. Dep., pp. 87, 89-90.

Lt. Loscalzo was required to conduct daily rounds at Beacon.   Rounds consisted of inspecting the facility to ensure that the facility was secure and was in compliance with departmental rules and regulations.  Crow. Dec., ¶ 10; P. Dep., 173. While a supervisor is on rounds inmates are

permitted to complain about the conduct of staff. Id. Inmates at Beacon are permitted to either file a formal grievance through the Inmate Grievance Program ("IGP") or complain directly to any supervisory personnel about the conduct of officers. Los. Dec., 84; Declaration of Barbra Lapidus ("Lap. Dec."), ¶ 29; McC. Dec., Exhibit F, Declaration of Vera Bennett ("Ben. Dep."), pp. 13-14; McC. Dec., Exhibit G, Deposition of Michelle Fields ("F. Dep."), pp. 16-17.

## C. Use of Force

On February 4, 2003, at about 9:30 p.m., plaintiff was involved in a use of force against Inmate Mercedes Hughes in Housing Unit # 5 at Beacon. McC. Dec., Exhibit R, Use of Force Report, Bate Stamp D295-303 (hereinafter "U of F"). Plaintiff denies he used excessive force.

### 1. Plaintiff's Allegations

Plaintiff alleges that, as a result of the disruptive behavior of Inmate Hughes, he asked that she be escorted off of the unit. P. Dep., pp., 267-68; U of F, p. D302. Officer Alfred Tchorznicki was dispatched by the Watch Commander to escort Inmate Hughes off of the unit. Id. Inmate Hughes continued to be loud and obnoxious after Officer Tchorznicki arrived on the unit. P. Dep., p. 268. Plaintiff alleges that he decided to approach Inmate Hughes in her cube to order her to get her coat and to leave with Officer Tchorznicki. P. Dep., pp. 268, 284. Plaintiff denies that Officer Tchorznicki attempted to prevent him from approaching the cube. P. Dep., p. 289. When plaintiff arrived at Inmate Hughes' cube, he told her to get her coat and go with the officer. Id., p. 294. She responded by telling plaintiff that she was waiting on him, and went towards him with her fists raised. Id., pp. 294-295. Inmate Hughes grabbed plaintiff's lapel and he grabbed her wrists. Id., pp. 269, 297.

Plaintiff alleges that Inmate Hughes struggled for a couple of minutes, while he held her wrists, before Officer Tchorznicki intervened. P. Dep., p. 296-297. Officer Tchnornicki placed a

cuff on one of Inmate Hughes' arm, but she continued to hold plaintiff with the other arm. McC. Dec., Exhibit S, Inspector General Investigation (Confidential 6-189) (hereinafter "IG. Inv."), Confidential 171, 178. After the cuff was placed on Inmate Hughes' wrist, she released her other hand. Id., Confidential 171. Inmate Hughes was secured by only one cuff when plaintiff left the cube. Id., Confidential 178. As plaintiff was walking away Inmate Hughes was still verbally abusive, and there are at least two other inmates in or near the cube. Id., pp. 178- 179. Plaintiff prepared a memorandum and an Inmate Misbehavior Report memorializing his version of the incident. McC. Dec., Exhibit R, D; Exhibit S, Confidential. (respectively).

**2.     Inmate Complaints**

On or about February 5, 2003, Lt. Loscalzo was approached by up to five inmates regarding the use of force incident the previous night. Los. Dep., pp. 82, 215; Lap. Dec., ¶ 28. The inmates complained that "Officer Henderson did not have to, 'Grab that girl,' and that Tchorznicki was there to take care of it and he pushed Tchorznicki away." Los. Dep., p. 74; Lap. Dec., ¶¶ 13-20, 30. Lt. Loscalzo advised the inmates that if they want to file a complaint they should do so in writing. Los. Dep, pp. 83, 216; Lap. Dec., ¶ 30.

Shortly thereafter, administration at Beacon received a letter from Inmate Barbra Lapidus complaining about the conduct of Officer Henderson. IG. Inv., Confidential 26-28. In addition administration received two anonymous letters. IG. Inv., Confidential 25, 29-30. The inmate letters allege that plaintiff exacerbated an already tense situation and he was the initial aggressor in the incident with Mercedes Hughes. Id. The inmate complaints appeared to be credible because of their consistency. Los. Dep., p. 321. Lt. Loscalzo did not ask Inmate Lapidus to lie about the incident on February 4, 2003. Lap. Dec., ¶ 31.

Lt. Loscalzo advised Superintendent Dennis Crowley that inmates on Housing Unit 5 were complaining about the conduct of plaintiff (Los. Dep., p. 71), and that some inmates had sent letters of complaint. Id., p. 69. In addition, Lt. Loscalzo reviewed the use of force report and found the information contained therein "peculiar." Id., pp. 306- 07. Lt. Loscalzo found it peculiar that Inmate Hughes was not fully restrained, that Officer Henderson left the cube before Inmate Hughes was fully restrained, and that another inmate helped escort Inmate Hughes to the watch commanders office. Id., p. 307. Accordingly, Lt. Loscalzo recommended to the Superintendent that the matter be investigated further by the IG. Los. Dep., pp. 307, 353; McC. Dec., Exhibit T, Electronic Message, D225 (hereinafter "E-Mail"). This recommendation was based on a review of the use of force reports, the accompanying memorandums and inmate statements. E-Mail; Los. Dep., p. 314.

On February 6, 2003, Superintendent Crowley reviewed the Use of Force Report for the incident. Crow. Dec., ¶ 16. The report included memoranda from plaintiff and Officer Alfred Tchorznicki. Id. Based on the documentation provided, Superintendent Crowley determined that it seemed that the use of force was appropriate. Id., ¶ 17.

However, Superintendent Crowley also concluded that there were troubling aspects to the description of the incident as provided by plaintiff. Id., ¶ 18. For instance, it was clear from plaintiff's memorandum that Inmate Hughes was agitated and hostile towards plaintiff. U of F, p. D302-303. Plaintiff's memorandum did not adequately explain why plaintiff approached Inmate Hughes's cube, even though Officer Tchorznicki was on the unit to escort the inmate. Crow. Dec., ¶ 18. Officers are trained to diffuse situations when possible. Plaintiff's conduct in approaching Inmate Hughes's cube had the opposite effect. Id. In addition, Officer Tchorznicki's memorandum indicated that after, Inmate Hughes became physically engaged with plaintiff, plaintiff left the cube, even though the inmate was not yet fully restrained. Crow. Dec., ¶ 18; U of F, p. D300-301.

Superintendent Crowley also considered that the incident took place on a housing unit and was witnessed by a number of inmates. A belief by inmates that an officer used excessive force can exacerbate the relationship between inmates and staff. Crow. Dec., ¶ 19. Therefore, Superintendent Crowley determined that the use of force in this incident should be investigated by the IG. Id., ¶ 20. Superintendent Crowley felt it was necessary for an outside agency investigate the incident to ensure the impartiality of the investigation. Id. The determination to refer the matter to the IG was not based on plaintiff's race, age, years with DOCS, or in retaliation. Id., ¶ 24.

On February 7, 2003, Superintendent Crowly requested that the IG investigate the use of force incident on February 4, 2003. Crow. Dec., ¶ 22; IG Inv., Confidential 20-23. Once the case was referred to the IG, Superintendent Crowley was not involved in the investigation. Crow. Dec., ¶ 27. Moreover, Lt. Loscalzo was not involved in the investigation of the February 4, 2003 use of force. Los. Dep., pp. 340-341, 348.

**D.    Inspector General Investigation**

On February 18, 2003, Investigator Steven Shaner was assigned to conduct an investigation to determine if there was any employee misconduct. Declaration of Steven Shaner ("Shaner Dec."), ¶ 6. Upon assignment Investigator Shaner reviewed the Use of Force Report for the incident, an anonymous letter from an inmate alleging that plaintiff went around another officer to get to Inmate Hughes (IG Inv., Confidential 25), and a letter from Inmate Barbra Lapidus alleging that plaintiff pushed another officer out of the way and grabbed Inmate Hughes (Id., Confidential D26-28). Shaner Dec., ¶ 8. Investigator Shaner determined that he would interview as many inmates as necessary who were present on the block at the time of the incident. Id., ¶ 10. In addition to Inmate Hughes, thirty-four inmates were interviewed.

Two inmates had no direct knowledge of the incident on February 4, 2003. (IG Inv., Confidential 73 and 96). Shaner Dec., ¶ 20. However, twenty inmates corroborated in substantial detail the version of the incident as told by Inmate Hughes, to wit: Inmate S.C. (IG Inv., Confidential 64-67); Inmate M.M. (Id., Confidential 68-72); Inmate M.B. (Id., Confidential 75-76); Inmate G.R. (Id., Confidential 77-80); Inmate I.T. (Id., Confidential 81-82); Inmate C.N. (Id., Confidential 85-86); Inmate B.R. (Id., Confidential 87-88); Inmate I.C. (Id., Confidential 89-90); Inmate M.A. (Id., Confidential 97); Inmate T.R. (Id., Confidential 98-99); Inmate S.O. (Id., Confidential 100-102); Inmate B.L. (Id., Confidential 103-104); Inmate L.G. (Id., Confidential 109-111); Inmate L.C. (Id., Confidential 112-114); Inmate D.O. (Id., Confidential 115-116); Inmate S.N. (Id., Confidential 119); Inmate M.N. (Id., Confidential 120-123); Inmate J.M. (Id., Confidential 129-130); Inmate P.R. (Id., Confidential 131-133); Inmate T.M. (Id., Confidential 134-135). The inmates all related that there was a heated verbal exchange between Inmate Hughes and plaintiff; that plaintiff approached Inmate Hughes' cube; that at the time plaintiff approached the cube, Officer Tchorznicki was on the unit; that plaintiff grabbed Inmate Hughes first; that Officer Tchorznicki had only one handcuff on Inmate Hughes; and, that plaintiff left the cube even though Inmate Hughes was not fully restrained. Shaner Dec., ¶ 21.

Twelve inmates corroborated the incident from the time plaintiff and Inmate Hughes became physically engaged, to wit: Inmate A.C. (Id., Confidential 83-84); Inmate K.R. (Id., Confidential 91-92; 137-139); Inmate P.R. (Id., Confidential 93-94); Inmate M.D. (Id., Confidential 95); Inmate V.B. (Id., Confidential 105-106); Inmate T.C. (Id., Confidential 107-108); Inmate A.F. (Id., Confidential 117-118); Inmate S.P. (Id., Confidential 74); Inmate J.O. (Id., Confidential 124); Inmate D.S. (Id., Confidential 125-126); Inmate S.W. (Id., Confidential 127-128); Inmate S.C. (Id., Confidential 64-67); Inmate P.R. (Id., Confidential 136). Shaner Dec., ¶ 22. All of these inmates related that Officer

Tchorznicki had only one handcuff on Inmate Hughes; and that plaintiff left the cube even though Inmate Hughes was not fully restrained. Id.

Officer Tchorznicki stated that on February 4, 2003, at about 9:15 p.m., he was directed by Sergeant Ohlinger to proceed to Housing Unit #5 to escort an inmate back to the watch commander's office. IG Inv., Confidential 145. Sgt. Ohlinger directed Officer Tchorznicki to bring a pair of hand-cuffs. Id. When he arrived on the unit Officer Henderson was at the officer's desk, plaintiff pointed to Inmate Hughes. Id. Officer Tchorznicki directed Inmate Hughes to retrieve her coat and ID card. Id. Officer Tchormicki approached the plaintiff who was sitting at the officer's desk. Id. As Inmate Hughes was walking toward her cube, plaintiff got up from his desk. Id., Confidential 146. As plaintiff left the desk area, Officer Tchorznicki told plaintiff that he would take care of it and put up both his hands in front of plaintiff. Id. Plaintiff physically brushed Officer Tchorznicki's hands away and proceed toward Inmate Hughes' cube. Id. After a moment Officer Tchorznicki approached Inmate Hughes' cube. At the time he approached the cube plaintiff and Inmate Hughes were already entangled, and other inmates were surrounding the cube. Id. When presented with an opportunity Officer Tchorznicki applied a handcuff to Inmate Hughes' right wrist. Id., Confidential 147. Inmate Ballard entered the cube and took a hold of Inmate Hughes' left wrist as Inmate Reid entered the cube. Id. At this point plaintiff left the cube with Inmate Reid. Id. Plaintiff left the cube even though Inmate Hughes was not restrained. Id. Officer Tchorznicki was able to restore order and discipline by talking to the inmate, and without the use of any additional force. Id., Confidential 148.

17 inmates stated that they observed plaintiff push past Officer Tchorznicki's to get to Inmate Hughes' cube. See, Inmate S.C. (Id., Confidential 65); Inmate M.M (Id., Confidential 70); Inmate G.R. (Id., Confidential 78); Inmate M.A. (Id., Confidential 97); Inmate I.C. (Id., Confidential 90);

Inmate T.R. (Id., Confidential 98); Inmate S.O. (Id., Confidential 101); Inmate B.L. (Id., Confidential 103); Inmate L.G. (Id., Confidential 110); Inmate L.C. (Id., Confidential 113); Inmate D.O. (Id., Confidential 115); Inmate M.N. (Id., Confidential 121); Inmate J.M. (Id., Confidential 129); Inmate P.R. (Id., Confidential 132); Inmate A.C. (Id., Confidential 83-84); Inmate S.N. (Id., Confidential 119); Inmate T.M. (Id., Confidential 134). Shaner Dec., ¶ 24.

Investigator Shaner concluded that plaintiff committed serious misconduct by acting in an unprofessional manner that threatened institutional security. There was no justification for plaintiff to approach Inmate Hughes' cube. Use of force is never a proper response to an inmate's verbal provocations. Plaintiff pushed past Officer Tchorznicki's to get to Inmate Hughes' cube. Plaintiff then left Officer Tchorznicki alone in the cube with an inmate who was not restrained. Officer Tchorznicki was left with the option of using force to restore order or trying to calm the inmate through interpersonal communications. Shaner Dec., ¶ 29.

In addition, Investigator Shaner reviewed the audio-tapes of Inmate Hughes' Tier III hearing held on February 10, 2003. Shaner Dec., ¶ 31. At the disciplinary hearing Officer Tchorznicki testified that plaintiff pushed past him to get to Inmate Hughes cell. McC. Dec., Transcript of Tier III Disciplinary Procedure, Exhibit BB (hereinafter "Tr.") Tr., p. 16; IG. Inv., Confidential 150. At the disciplinary hearing plaintiff denied pushing past Officer Tchorznicki to get to Inmate Hughes' cube. Tr., p 23; IG. Inv., Confidential 150-151. An officer is required to give truthful information at a disciplinary hearing. Plaintiff, when asked directly whether he pushed past Officer Tchorznicki, denied having done so. Shaner Dec., ¶ 34. On April 4, 2003, Investigator Shaner interviewed plaintiff at DOCS' central office in Albany, New York. Shaner Dec., ¶ 37. Plaintiff was accompanied by an attorney and two union representatives. Id. The interview was transcribed and plaintiff was sworn. See, IG. Inv., Transcript of Interview, Confidential 159-189. At the interview,

Officer Henderson denied he pushed past Officer Tchorznicki to get to Inmate Hughes' cube. Id., Confidential 169, 184. Plaintiff stated his memorandum, use of force report, and his testimony during the Tier III were all accurate and truthful. Id., Confidential 172-173. Plaintiff was given an opportunity to add any information he believed relevant. Id., Confidential 187-188.

Investigator Shaner concluded that the version of the events as provided by the inmates, and corroborated by Officer Tchorznicki, was credible. Shaner Dec.,¶ 46. This determination was based on the fact that the versions provided by the inmates and Officer Tchorznicki were consistent in substantial detail. Id. As a result Investigator Shaner concluded that the allegation of excessive force was substantiated, and that plaintiff provided false testimony, falsified reports and abandoned a fellow officer. IG. Inv., Confidential 7-8; Shaner Dec.,¶ 47. This determination was based solely on Investigator Shaner's investigation. He did not discuss his findings with Lieutenant Anthony Loscalzo or Commissioner Glen Goord. Id.; Los. Dep., pp. 340-341.

The Investigative Report is eventually reviewed by the Inspector General, who makes the determination as to whether the matter will be referred to Labor Relations for disciplinary action. Shaner Dec.,¶ 52. Determinations of whether or not to pursue disciplinary proceedings against staff are made by Labor Relations, not the IG. Id., ¶ 53. Once a recommendation is forwarded to the Director of Labor Relations to take disciplinary action the IG is not involved in the decision to take further action. Id.

**E.**     **Notice of Discipline**

On or about April 17, 2003, the Bureau of Labor Relations ("BLR") received a referral for disciplinary action from the IG which included the IG Investigative Report.  Declaration of Keith Barto ("Barto Dec."), ¶ 8; IG Inv., Confidential D7-Confidential 10.  The Investigative Report substantiated an allegation that plaintiff used unnecessary and excessive force against an inmate on February 4, 2003 at Beacon, and abandoned a fellow officer attempting to restrain the inmate.  In addition, the Investigative Report substantiated allegations that plaintiff provided false testimony and false reports with reference to the investigation of the above referenced incident. IG Inv., Confidential D7-Confidential 10.

Excessive use of force against an inmate by an officer is serious misconduct.  Excessive force creates an adversarial relationship between officers and inmates that threatens institutional security. Preparing false reports and providing false testimony undermines the ability of DOCS to investigate allegations of misconduct, thereby threatening institutional security.  A correctional facility can be a volatile place where immediate action is required to restore order and discipline.  Correction Officers must feel secure that they will receive back-up when they are required by the situation to take action.  Failure to provide that back-up threatens institutional security.   Barto Dec., ¶ 11.

Upon consideration, it was determined that a Notice of Discipline ("NOD") would be issued seeking Plaintiff's dismissal from service.  Barto Dec., ¶ 12; McC. Dec., Exhibit A, Disciplinary Hearing Package (D307-D668) (hereinafter "Ex. A."), pp. D404-405.  In assessing the proposed penalty, BLR considered that plaintiff precipitated this situation by approaching the inmate's cube when he knew she was upset, when another officer was present on the unit, and that he pushed past that officer who had advised plaintiff that he would "handle" the situation.  Plaintiff exacerbated a

situation that was under control into a situation that threatened institutional security. Barto Dec., ¶ 12.

The determination to issue the NOD was based on the information contained in the IG referral. Barto Dec., ¶ 15. The labor representative from BLR did not consult Commissioner Glenn Goord, Lieutenant Anthony Loscalzo or any one else at Beacon Correctional Facility before recommending the NOD be issued. Id., ¶ 15.

The determination to issue a NOD is made by the Bureau of Labor Relations pursuant to the Collective Bargaining Agreement and the Civil Service Law. The Director of the Bureau of Labor Relations is authorized to issue a NOD. There is no requirement that Commissioner Glenn Goord be notified before a NOD is issued. Id., ¶ 17. Commissioner Goord was not consulted prior to, or advised that, the BLR issued a NOD against plaintiff. Id.; Declaration of Glenn Goord ("Goord Dec."), ¶ 4.

The NOD alleged that plaintiff (1) used excessive and unnecessary force against an inmate; (2) failed to render assistance to another Officer in restraining the inmate; (3) submitted reports which he knew contained false information; (4) provided false testimony in an inmate disciplinary hearing; and, (5) provided false testimony to an investigator from the Inspector General's Office investigating the incident. Ex. A, D404-405. The NOD sought Mr. Henderson's dismissal from service and loss of any accrued annual leave. Id.

**F.**     **Arbitration Hearing**

The arbitration hearing commenced on January 8, 2004 before Thomas J. Newman. The hearing continued on February 10, 2004, and was closed on March 12, 2004 with the submission of the post-hearing briefs. McC. Dec., Exhibit V, Opinion and Award of Arbitrator (D3-D11)(hereinafter "Award"), D 4.

The State had the burden of proving the charges contained in the Notice of Discipline dated April 28, 2003. Barto Dec., ¶ 28. Based on the evidence presented, the arbitrator found that the State met its burden of proof on each of the charges of misconduct in the Notice of Discipline. Award, D9. The arbitrator concluded that the testimony of Officer Tchorznicki established that on February 4, 2003 at about 9:30 p.m., the plaintiff used excessive and unnecessary force on Inmate Hughes, knowing she was upset and knowing Officer Tchorznicki was there to take her off of the unit. Id., D10. Based on the credible evidence of what transpired on February 4, 2003, the arbitrator found that the reports prepared by plaintiff contained false and/or misleading information regarding the subject incident with inmate Hughes. Id. The arbitrator also found that plaintiff gave false and/or misleading testimony at Inmate Hughes' Tier 3 hearing and in his testimony before Investigator Steven Shaner of the Department's Inspector General's Office on April 3, 2003. Id. Accordingly, the arbitrator denied the grievance and permitted DOCS to discharge plaintiff. Id., D10-11.

This lawsuit followed.

## ARGUMENT
## SUMMARY JUDGMENT STANDARD

Defendants' motion for summary judgment should be granted because there "are no genuine issue[s] as to any material fact" and because defendants are "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). This Court has held that a "fact is 'material' if it 'might affect the outcome of the suit under the governing law,'" and an issue of fact genuine where "'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Kelly v. Lex, Inc., 03 Civ. 2778 (GEL), 2004 U.S. Dist. LEXIS 15143 (S.D.N.Y. July 27, 2004), citing Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). While the "evidence must be viewed in the light most favorable to the nonmoving party," Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995), plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), and his "[c]onclusory allegations or unsubstantiated assertions" cannot create a genuine factual dispute. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita, 475 U.S. at 587.

### PLAINTIFF'S CLAIMS PURSUANT TO ADEA
### MUST BE DISMISSED

Plaintiff alleges that dependants intentionally discriminated against him pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §626. Cmpl., ¶ 36. However, plaintiff's claim pursuant to the ADEA must be dismissed. Congress has decreed that no civil action may be commenced under ADEA until 60 days after the filing of an administrative complaint of discrimination with the Equal Employment Opportunity Commission ("EEOC") – or, in a "deferral" state like New York, with the state's Human Rights Commission. See 29 U.S.C. §§ 626(d), 633(b); Lightfoot v. Union Carbide Corp., 110 F.3d 898, 906-07 (2d Cir. 1997). Plaintiff did not file any claim alleging age discrimination with the EEOC or the New York State Department of Human Rights. McC. Dec., Exhibit W, Defendants' First Request to Admit and Plaintiff's responses thereto. He has not satisfied the prerequisite to suit, and his claim must be dismissed.

**ALL SECTION 1983 CLAIMS THAT ACCRUED BEFORE
JANUARY 10, 2002 ARE TIME BARRED,AS IS THE
SECTION 1981 CLAIMS THAT ACCRUED BEFORE
JANUARY 10, 2001**

Plaintiff alleges that Lt. Loscalzo retaliated against him for his testimony in the Colon matter by (1) investigating grievances in 2000; (2) attempting to get inmates to file grievances against him in 2000; (3) referring an investigation that plaintiff was the father of an inmate's child to the IG without first speaking to him in May, 2000; (4) allowing inmates to question him directly in a Tier III hearing in December, 2000; (5) asking plaintiff to sign a factually accurate memorandum on January 10, 2001; (6) attempting to give plaintiff a formal counseling in June, 2000, for Time and Attendance abuse even though he had not yet received an informal counseling; and, (6) giving him a negative evaluation on November 2, 2001.

This lawsuit was filed on June 10, 2005. "A claim accrues, and the limitations period begins to run, when the plaintiff knows, or should know, of the decision or act that gave rise to the injury." Weiss v. La Suisse, 381 F. Supp.2d 334, 338 (S.D.N.Y. 2005) (citing, Singleton v. City of New York, 632 F. 2d 185, 191 (2d Cir. 1980)). The statute of limitations for a Section 1981 claim is four years. Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369 (2004). The statute of limitations for Section 1983 claims in New York is three years. Veal v. Geraci, 23 F.3d 722, 724 (2d Cir. 1994). The Supreme Court recently clarified that the continuing-violation doctrine does not apply to discrete acts, but only to ongoing circumstances that combine to form a single violation that 'cannot be said to occur on any particular day. National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113-15 (2002). Accordingly, all of plaintiff's claims of discrete acts of retaliation and discrimination brought pursuant to Section 1981 (race discrimination) that occurred prior to January 10, 2001 are

time barred. Moreover, all of plaintiff's claims of discrete acts of retaliation and discrimination brought pursuant to Section 1983 that occurred prior to January 10, 2002 are time barred.

Each of the acts set forth above is a discrete act, and so plaintiff cannot save his time-barred claims under any theory of continuing violation.

## PLAINTIFF HAS FAILED TO ESTABLISH RETALIATION

"[E]mployment discrimination claims under Sections 1981 and 1983 are evaluated under the same analytical framework as those brought under Title VII." <u>Rumala v. New York City Transit Auth.</u>, 2005 U.S. Dist. LEXIS 19766 , *36 (E.D.N.Y. 2005)(<u>citing</u> <u>Jessamy v. City of New Rochelle</u>, 292 F. Supp. 2d 498, 511 (n. 15)(S.D.N.Y. 2003)0.  In order to establish retaliation "plaintiff must prove that [he] engaged in a protected activity known to defendant, [he] was subjected to adverse employment action, and there is a causal connection between the protected activity and the adverse employment action." <u>Tasadfoy v. Ruggiero</u>, 365 F. Supp.2d 542, 549 (S.D.N.Y. 2005)(<u>citing</u> <u>Feingold v. New York</u>, 366 F.3d 138, 156 (2d Cir. 2004)).

"If a plaintiff sustains the initial burden, a presumption of retaliation arises. In turn, under the second step of the burden-shifting analysis, the onus falls on the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. Finally, as for the third step, once an employer offers such proof, the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." <u>Jute v. Hamilton Sundstrand Corp.</u>, 420 F.3d 166, 173 (2d Cir. 2005)(citations omitted).  "Evidence casting doubt

on the employer's proffered justification 'may -- or may not -- be sufficient' to establish pretext."
Taylor v. Lenox Hill Hospital, 00 Civ. 3773 (GEL), 2003 U.S. Dist. LEXIS 5429, *18 (S.D.N.Y.
April 3, 2003) (quoting Vassar College, 114 F.3d at 1333). "The requirements of the...prima facie
case are so minimal that they do not necessarily support any inference of discrimination; and there
are so many reasons why employers give false reasons for an adverse employment action that
evidence contradicting the employer's given reason -- without more -- does not necessarily give
logical support to an inference of discrimination." Collette v. St. Luke's Roosevelt Hosp., 00 Civ.
4864 (GEL), 2002 U.S. Dist. LEXIS 18164, *10 (S.D.N.Y. Sept. 26, 2002) (citations omitted).

**A.      Pre-Termination Acts**

   **1.      No Adverse Employment Action**

   Not every disciplinary action taken against an employee is "adverse employment action";
rather, only a "'materially adverse change' in the terms and conditions of employment" is actionable
under a disparate treatment theory. See Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640
(2d Cir. 2000). To be "'materially adverse,' a change in working conditions must be more disruptive
than a mere inconvenience or an alteration of job responsibilities." Weeks v. New York State, 273
F.3d 76, 85 (2d Cir. 2001)(quoting Galabya at 640). Such a change is indicated "by a termination
of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a
material loss of benefits, significantly diminished material responsibilities, or other indices...unique
to a particular situation." Weeks, 273 F.3d at 85.

   Plaintiff alleges he was subjected to a number of acts of harassment by Lt. Loscalzo in
retaliation for his testimony in the Colon matter. The vast majority of these allegations are time
barred and will not be further discussed. I turn to the most recent allegations of retaliatory conduct.

(1) Plaintiff had an uneasy relationship with Lt. Loscalzo between January, 2001 and December, 2002. Plaintiff alleges that inmates advised him that Lt. Loscalzo was questioning them about plaintiff. P. Dep., p. 344. However, plaintiff was not disciplined by Lt. Loscalzo during this period, and plaintiff's job requirement did not change. Id., pp. 344-345. Accordingly, plaintiff's claim that Lt. Loscalzo retaliated against him during this period fails for want of adverse employment action.

(2) Lt. Loscalzo reviewed plaintiff's evaluation for the period July 5, 2000 to July 6, 2001. McC. Dec., Exhibit Z, Employee Evaluation (hereinafter "Eval."); Los. Dep., p. 329. The evaluation gave plaintiff an "excellent" performance rating. Eval., § IV. Plaintiff acknowledges that Lt. Loscalzo never downgraded his evaluation. P. Dep., p. 130. On November 2, 2001, Lt. Loscalzo wrote, "Officer Henderson enforces rules and regulations with great diligence. He is reliable and dependable and would benefit from being able to perform the tasks w/ less complaints from inmates." Eval., ¶ V. Plaintiff alleges that the portion of Lt. Loscalzo's review that noted that plaintiff "would benefit from being able to perform the tasks w/ less complaints from inmates" was added in retaliation for his testimony in the Colon matter. P. Dep., pp. 132-133. Assuming arguendo that the addition of the statement that plaintiff "would benefit from being able to perform the tasks w/ less complaints from inmates" is negative, plaintiff has still not established an adverse employment action. "[E]valuations are adverse employment actions only if they affect ultimate employment decisions such as promotions, wages or termination." Johnson v. Connecticut, Dept. of Corr., 2005 U.S. Dist. LEXIS 22395, *35 (D. Conn. 2005)(quoting Knight v. City of New York, 303 F. Supp.2d 485, 497(S.D.N.Y. 2004)). There is no evidence in the record before me that any adverse consequences followed from this criticism. Insofar as plaintiff might have suggested that his termination was the adverse consequence, he cannot prevail as a matter of law, because he was

not fired until April 2004 – years after this mildly critical remark appeared in an otherwise glowing performance review.

(3) On January 8, 2003, plaintiff made an announcement to the inmates on Housing Unit 5 that he did not appreciate "anybody lying about [him]". P. Dep., p. 254. As a result of plaintiff's announcement, plaintiff was issued a formal counseling on February 10, 2003 by Lt. Loscalzo. McC. Dec., Exhibit O, Coun. Memo. Plaintiff alleges that this counseling memorandum was in retaliation for his testimony in the Colon matter. P. Dep., pp. 261-262. "[I]t is already settled law in this Circuit that the receipt of a counseling memo or notice of discipline does not constitute an adverse employment action." Magilton v. Tocco, 379 F. Supp.2d 495, 507 (S.D.N.Y. 2005)(citing Weeks v. New York State Div. of Parole, 273 F.3d 76, 86 (2d Cir. 2001)).

## B.    Termination

### 1.    No Casual Connection

Plaintiff was issued a NOD on April 28, 2003 as a result of an incident that occurred on February 4, 2003. McC. Dec., Ex. A, D404-405. Plaintiff was terminated as the result of an arbitrator's decision on April 2, 2004. McC. Dec., Ex. V. Plaintiff alleges that the NOD was issued in retaliation for his deposition testimony in the sexual harassment lawsuit brought against Lt. Loscalzo by Officer Colon in the late 1990s. Cmpl., ¶ 15. Plaintiff testified in the Colon matter on February 24, 1999. See, McC. Dec., Ex. D.

Plaintiff has presented no direct evidence of retaliatory animus on Lt Loscalzo's part. Therefore, any inference of retaliation must arise from the temporal proximity between the protected activity and the retaliatory act to establish a casual connection. For mere temporal proximity to establish causality, the intervening period must be "very close." Clark County Sch. Dist. v. Breeden,

532 U.S. 268, 273,(2001). Causal connection cannot be established based upon temporal proximity where the alleged adverse employment action is too temporally remote from the alleged protected activity. See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (noting that "the cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close'") (internal citation omitted). "Claims of retaliation are routinely dismissed when as few as three months elapse between the protected EEO activity and the alleged act of retaliation." Nicastro v. Runyon, 60 F. Supp.2d 181, 185 (S.D.N.Y. 1999).

Here, more than four years separate the protected activity (deposition testimony) and the alleged retaliatory action (termination). "Although there is no bright line test for how close in time the adverse action must be to the protected activity, courts have found less time to be insufficient to establish a causal connection." Rinsler v. SONY, 2003 U.S. Dist. LEXIS 14754, *35 (S.D.N.Y. 2003)(citing, Hollander v. American Cyanamid Co., 895 F.2d 80, 85 (2d Cir. 1990) (finding period of three months between the protected activity and the adverse action to be insufficient to make out a prima facie case)). Thus, no inference of retaliatory animus based upon temporal proximity can be drawn between plaintiff's February, 1999 deposition testimony complaint and any of DOCS's decisions regarding his employment Nor do the alleged retaliatory acts in 2000 and early 2001 provide the casual connection. Plaintiff acknowledges that between January, 2001 and December, 2002 there were no acts of retaliation against him. P. Dep., pp. 343-345.

## 2. Legitimate, Nonretaliatory Reason for Termination

Assuming arguendo that plaintiff's claim of retaliation was not too remote from the protected activity, defendants had a legitimate, nonretaliatory reason for seeking plaintiff's termination. The NOD was issued by Labor Relations exclusively on the basis of the Inspector General's investigation. It is undisputed that defendants Loscalzo and Goord were not consulted by Labor Relations in choosing the disciplinary penalty sought by Labor Relations. Barto Dec. ¶¶ 15, 70 . Other than recommending that the use of force incident be investigated by the IG, Lt. Loscalzo played no role in the IG investigation or the subsequent arbitration. Los. Dep., pp. 340-341, 348. And Commissioner Goord played no role in the decision to investigate the use of force, the investigation of the force, the decision to issue a NOD, or plaintiff's termination. Declaration of Glenn Goord ("Goord Dec."), ¶ 4. Finally, the act plaintiff is presumably most aggrieved by -- his termination -- was the product of independent arbitrator's decision following a full arbitration hearing.

In light of the above, plaintiff can point to nothing in the "surrounding circumstances" of the NOD that "gives rise to an inference of discrimination." Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 95 (2d Cir. 1999); McDonnell Douglas, 411 U.S. at 802. Hence, he fails to make out a prima facie case. In any case, even if plaintiff could shift the burden back to defendants, the decision to seek termination was based on sound evidence that established that plaintiff used excessive force on February 4, 2003, that he provided false reports concerning the incident, that he provided false testimony at the Tier III hearing and during his IG interview, and failed to render assistance to another officer.

Officer Tchorznicki provided evidence, deemed credible by the arbitrator, that he tried to stop plaintiff from approaching Inmate Hughes' cube, but plaintiff pushed him aside to approach the cube, Tch. Dep. 49, and that plaintiff left him alone in the cube with a noncompliant inmate. Tch. Dep., p. 46. In addition, Investigator Shaner interviewed 34 of the 47 inmates on Housing Unit 5 at the time of the use of force incident. Shaner Dec., ¶¶ 18, 19. Twenty inmates corroborated Inmate Hughes' account that plaintiff was the initial aggressor in the cube. Id., ¶ 21. Seventeen inmates observed plaintiff push past Officer Tchorznicki to get to plaintiff's cube. Id., 24. All of the inmates, save one, corroborate that plaintiff left the even though Inmate Hughes was not fully restrained. Id., ¶¶ 21, 22. In view of the evidence that the arbitrator deemed credible, he concluded that Plaintiff's file memorandum concerning the incident contained false statements about what happened. See, McC. Dec., Ex. R, D302-303. Moreover, plaintiff denied at both the Tier III and the IG interview that he pushed past Officer Tchorznicki or that he was the initial aggressor of the use of force incident – more false statements. See, McC. Dec, Ex. BB; Ex. S, IG Inv., Confidential 159-189.

The cumulation of this evidence was sufficient to convince the independent arbitrator (who had the opportunity to perceive plaintiff's testimony on the issue), and clearly satisfies defendants' burden under McDonnell Douglas to articulate a legitimate basis for the adverse employment action taken. Plaintiff, who has defaulted in responding to this motion, offers not a shred of evidence that this determination was a pretext for retaliation. Accordingly, defendants are entitled to summary judgment on plaintiff's retaliatory termination claim.

Additionally, the claims involving the allegedly retaliatory termination must be dismissed as against defendant Goord for lack of personal involvement. Liability of supervisory officials under 42 U.S.C. § 1983 cannot be premised on respondeat superior. Rather, the plaintiff must establish

fault and causation on the part of each defendant. Consequently, a defendant's personal involvement in the alleged constitutional violation is a pre-requisite to the imposition of damages. See, e.g., Monell V. New York City Department of Social Services, 43 U.S. 658, 690-695. (1978); Rizzo v. Goode, 423 U.S. 362, 370-371 (1976); Gill v. Mooney, 824 F.2d 192, 196 (2d Cir. 1987), Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1977), Alfaro Motors Inc. V. Ward, 814 F.2d 883, 886 (2d Cir 1986).

Plaintiff has named Commissioner Goord as a defendant because of his position with DOCS. P. Dep., p. 417. Plaintiff does not allege that Commissioner Goord reviewed his termination. P. Dep., p. 418. Plaintiff did not notify Commissioner Goord about any of the alleged acts of retaliation of Lt. Loscalzo. P. Dep., pp. 417-418. Indeed Commissioner Goord was never notified of plaintiff's allegations against Lt. Loscalzo, and did not review plaintiff's termination. Goord Dec., ¶ 4. Accordingly, plaintiff's claims against Glenn Goord must be dismissed.

## PLAINTIFF RECEIVED PROCEDURAL DUE PROCESS

"A two-prong test applies to analyze procedural due process claims. First, 'the threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution.' Second, 'if a protected interest is identified, a court must then consider whether the government deprived the plaintiff of that interest without due process.'" Barton v. City of Bristol, 294 F. Supp.2d 184, 197 (D. Conn. 2003)(emphasis in original)(quoting Narumanchi v. Bd. of Trustees, 850 F.2d 70, 72 (2d Cir. 1988)). Defendants do not contest that plaintiff had a protected property interest in keeping his job. However, plaintiff received due process before he was terminated from employment.

"The essential elements of due process are notice and an opportunity to be heard." <u>Koehler v. City of New York</u>, 2005 U.S. Dist. LEXIS 8901, *17-18 (S.D.N.Y. 2005)(<u>quoting</u> <u>Cleveland Bd. Of Educ. V. Loudermill</u>, 470 U.S. 532, 546 (1985)(due process requires only that a public employee receive 'oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story.")) Plaintiff received the NOD almost a year before the arbitration hearing commenced. Plaintiff was represented by counsel at the arbitration hearing. Barto Dec., ¶ 24; P. Dep., pp. 406-407. Plaintiff was permitted to cross-exam the witnesses who testified against him. P. Dep., 407. Plaintiff had the right to call witnesses in his own defense. Barto Dec., ¶ 25; P. Dep., p. 407. Plaintiff testified at the hearing and was given an opportunity to make a statement. Barto Dec., ¶ 26; P. Dep., p. 407-408. Plaintiff never advised the arbitrator that he was the victim of discrimination and/or retaliation. P. Dep., pp. 408-409.

Moreover, plaintiff had the option of challenging the arbitrator's decision in state court. Indeed, plaintiff did file an Article 78 proceeding in state court. He withdrew the action before the Court could render a judgement. McC. Dec., Exhibit AA, Order to Show Cause. The Second Circuit has held that an Article 78 proceeding provides a meaningful remedy where violations of due process are alleged. <u>Vargas v. City of New York</u>, 377 F.3d 200, 204 (2d Cir. 2004)(<u>citing</u> <u>Gudema v. Nassau County</u>, 163 F.3d 717, 724-725 (2d Cir. 1998)).

Accordingly, defendants are entitled to summary judgment on plaintiff's procedural due process claim.

## PLAINTIFF HAS FAILED TO ESTABLISH A
## SUBSTANTIVE DUE PROCESS VIOLATION

"Substantive due-process rights guard against government's exercise of power without any reasonable justification in the service of a legitimate governmental objective." Tenenbaum v. Williams, 193 F.3d 581, 600 (2d Cir. 1999)(citing County of Sacramento v. Lewis, 523 U.S. 833, 843, 140 L. Ed. 2d 1043, 118 S. Ct. 1708 (1998)) (internal quotation marks omitted).

> "The protections of substantive due process are available only against egregious conduct which goes beyond merely offending some fastidious squeamishness or private sentimentalism and can fairly be viewed as so brutal and offensive to human dignity as to shock the conscience." Smith v. Half Hollow Hills Cent. Sch. Dist., 298 F.3d 168, 173 (2d Cir. 2002) (quoting Johnson v. Glick, 481 F.2d 1028, 1033 & n.6 (2d Cir. 1973)). "Malicious and sadistic abuses of government power that are intended only to oppress or to cause injury and serve no legitimate government purpose unquestionably shock the conscience." Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 252 (2d Cir. 2001).

Barton, 294 F. Supp.2d at 198. As discussed DOCS had a legitimate governmental interest in terminating plaintiff's employment. It had credible evidence to believe he used excessive force, provided false documents, gave false testimony, and failed to render assistance to another officer. Accordingly, plaintiff's discharge from employment was not arbitrary, and defendants are entitled to summary judgment.

To the extent plaintiff's claims that Lt. Loscalzo's pre-termination supervision amounts to a substantive due process violation, his claim fails. The alleged misconduct by Lt. Loscalzo consists of interviewing inmates and investigating grievances. Such activity is not a malicious and sadistic abuse of government power. Accordingly, defendants are entitled to summary judgment on plaintiff's substantive due process claims.

# PLAINTIFF WAS NOT DENIED
## EQUAL PROTECTION

The elements of an Equal Protection claim and a Title VII claim "are generally the same[]" insofar as the former is premised upon race and/or gender discrimination. See Feingold v. New York, 366 F.3d 138, 159 (2d Cir. 2004) (citations omitted).  In cases where, as here, "the evidence of the alleged unlawful discrimination is only circumstantial, the sufficiency of a Title VII discrimination claim is assessed under the three-step burden-shifting analysis enunciated by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-805(1973)."  Wilson v. Grand Cent. P'ship, 2004 U.S. Dist. LEXIS 11051, *15 (S.D.N.Y. 2004).  Under the McDonnell Douglas burden shifting test, a plaintiff must first make out a prima facie disparate treatment case by showing that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the surrounding circumstances give rise to an inference of discrimination based on the plaintiff's membership in the protected class.  Fitzgerald v. Henderson, 251 F.3d 345, 356 (2d Cir. 2001); Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 95 (2d Cir. 1999); McDonnell Douglas, 411 U.S. at 802.

"Meeting this test 'creates a presumption that the employer unlawfully discriminated.'  This presumption 'places the burden of production on the employer to proffer a nondiscriminatory reason for its action.'"  Powell v. Consolidated Edison Co. of New York, Inc., 97 Civ. 2439 (GEL), 2001 U.S. Dist. LEXIS 2706, *30 (S.D.N.Y. March 12, 2001)(quoting Fisher v. Vassar College, 114 F.3d 1332, 1335 (2d Cir. 1997)).  "If the employer fails to present such a reason, plaintiff prevails."  Id.  "Once the employer 'articulates a non-discriminatory reason' for its actions, the presumption completely drops out of the picture.'"  Id. (quoting Fisher, 114 F.3d at 1336).  "At that point, 'the employer will be entitled to summary judgment...unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination.'"  Id. (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993)).  Plaintiff must

present evidence to prove "discrete actions taken by [his] employer which serve 'to discriminate against any conditions, or privileges of employment, because of [plaintiff's] race.'" <u>Germany v. DOCS</u>, 2003 U.S. Dist. LEXIS 16640, *13-14 (S.D.N.Y. 2003) (quoting 42 U.S.C. § 2000e-2(a)). "In essence, a differential treatment claim is one in which the plaintiff claims that he or she was treated differently than other similarly situated individuals on account of his or her race." <u>Id.</u> (citing <u>United States v. Ash</u>, 413 U.S. 300, 335-36 n.15 (1977)).

As previously discussed, plaintiff has failed to establish an adverse employment action for the alleged pre-termination discrimination. Indeed, he has not even met his burden of making out a prima facie case, since the undisputed facts establish that he was fired in circumstances that do not admit of an inference of discrimination. In addition, DOCS had a nondiscriminatory reason to seek plaintiff's termination. It had credible evidence that he used excessive force against an inmate, and lied about it afterwards. Plaintiff, by defaulting on this motion, has not met his burden of proving that the articulated reasons were a pretext for discrimination or retaliation, and the court sees no evidence in the record that would support such a finding. Moreover, plaintiff has failed to identify a single similarly situated individual who was treated differently than he. Accordingly, defendants are entitled to summary judgment on these claims as well.

## CONCLUSION

The remaining defendants' motion for summary judgment is granted, and the complaint is dismissed with prejudice. The Clerk of the Court is directed to enter judgment in favor of all defendants and to close the file.

Dated: March 14, 2006

_____
U.S.D.J.

BY FAX TO:

     Kevin P. McCaffrey, Assistant Attorney General
     Shari Hutton, Esq., counsel for plaintiff